UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Scott Achilles

    v.                                    Civil No. 16-cv-367-LM
                                         Opinion No. 2017 DNH 209
Nancy A. Berryhill, Acting
Commissioner of Social Security[1]


# O R D E R

Scott Achilles seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Acting Commissioner of the Social Security Administration, denying his application for Supplemental Security Income ("SSI") under Title XVI. Achilles moves to reverse the Commissioner's decision, contending that the Administrative Law Judge ("ALJ") erred in failing to give substantial weight to his treating physician's opinion and erred in her residual functional capacity assessment. The Acting Commissioner moves to affirm. For the reasons that follow, the decision of the Acting Commissioner is affirmed.

## Standard of Review

In reviewing the final decision of the Acting Commissioner in a social security case, the court "is limited to determining

---

[1] Nancy A. Berryhill became Acting Commissioner of the Social Security Administration on January 23, 2017, replacing Carolyn W. Colvin. See Fed. R. Civ. P. 25(d).

whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The court defers to the ALJ's factual findings as long as they are supported by substantial evidence. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).

In determining whether a claimant is disabled, the ALJ follows a five-step sequential analysis. 20 C.F.R. § 416.920. The claimant bears the burden through the first four steps of proving that her impairments preclude her from working.[2] Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Acting Commissioner has the burden of showing that jobs exist which the claimant can do. Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).

## Background

On September 13, 2013, Achilles filed for SSI benefits, alleging disability due to seizures and severe back pain. He originally alleged that he became disabled on November 15, 2008,

---

[2] The first four steps are (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether he has a severe impairment; (3) determining whether the impairment meets or equals a listed impairment; and (4) assessing the claimant's residual functional capacity and his ability to do past relevant work. 20 C.F.R. § 416.920(a).

but amended his onset date to November 21, 2012.  He was 36 years old in 2012 when he alleges that he became disabled.

I.  Medical Evidence

A.  Back Pain

The medical records related to Achilles' back pain begin in November 2012 when Achilles saw Dr. Adam Pearson, complaining of a history of chronic back pain that had increased in the previous six months.  Upon physical examination, Achilles appeared comfortable and in no acute distress with normal gait and leg strength, although he was tender in his back on palpation and his ability to flex and extend was limited by pain.  Dr. Pearson noted that Achilles had undergone an MRI in July 2012 which showed some degenerative changes but no scoliosis or spondylolisthesis.  Dr. Pearson also noted that Achilles's back pain was not radicular, and he scheduled Achilles for medical branch blocks.

On June 19, 2013, Achilles went to Paincare Centers for his back pain and was examined by Francis Valenti, APRN, CPNA. Nurse Valenti found that Achilles's gait, spine alignment, and mobility were normal, and that he had normal range of motion and strength in his arms and legs.  Nurse Valenti administered facet joint injections, which Achilles said did not help his everyday pain, although he appeared to be normal on examination.

Achilles was referred to physical therapy to improve his overall conditioning.

In August 2013, Achilles's primary care provider, Sonya Gilbert PA-C (a Certified Physician Assistant), noted that oxycodone was generally effective in controlling Achilles's back pain and that he took it only when the pain was severe. PA Gilbert's examination showed normal results although Achilles had a limited range of motion due to pain. Achilles saw PA Gilbert again in October and December 2013 and had similar exams, though he used a cane for assistance during the December visit.

Achilles saw Nurse Valenti at Paincare Centers again on September 25, 2013, and complained that physical therapy had exacerbated his lower-back pain, which was now radiating to his left leg. Despite those complaints, Achilles's examination yielded normal results. Nurse Valenti recommended a lumbar MRI to rule out a spinal disc issue. Achilles did not have an MRI and did not return to Paincare Centers.

In May 2014, Achilles told PA Gilbert that oxycodone was no longer working, and she increased the dosage. Upon examination, Achilles was pleasant and in no acute distress, although he had some indications of back pain. PA Gilbert ordered a lumbar MRI, but Achilles was unable to get the MRI because of insurance issues.

PA Gilbert referred Achilles to Dr. Paul Kamins for an orthopedic evaluation, which was done on October 9, 2014.  Upon examination, Achilles had positive straight-leg raising on the left and pain while bending.  His other results, including strength, were normal.  Dr. Kamins ordered a lumbar MRI, which showed a disc protrusion, a disc osteophyte, and mild right-sided foraminal narrowing.  The reviewing radiologist noted that the foraminal narrowing was also present on the November 2012 MRI, and observed that "there is nothing seen on the left side to correspond to the patient's increasing symptomatology."

B.  Seizures and Mental Health

On January 25, 2013, Achilles saw Dr. Gopalan Umashankar for evaluation of his seizures, and Achilles reported incidents of twitching, drooling, and some incontinence "after coming off the dilantin."  Dr. Umashankar prescribed Keppra and Lamictal for a four-week trial, and instructed Achilles not to drive.

On March 7, 2013, Achilles again saw Dr. Umashankar complaining of frequent staring spells.  His examination was unremarkable and Dr. Umashankar noted that it was "unclear if these staring spells are truly seizures or if the[s]e are absentmindedness."  Dr. Umashankar ordered a 24-hour EEG study, which confirmed that Achilles had general epilepsy but the EEG

was normal, despite Achilles's report of seizures during the test.

Achilles saw Dr. Barry Roth, a psychiatrist, for depression several times in late 2012 and early 2013 without any significant findings. On March 20, 2013, Achilles underwent a neuropsychological evaluation with Dr. Matthew Holcomb, a post-doctoral fellow operating under the supervision of Dr. Robert Roth, a neuropsychologist. Dr. Holcomb found that the testing and Achilles's reports were consistent with "mild frontal-temporal systems dysfunction, possibly greater for the left hemisphere," and that "the etiology of [Achilles's] cognitive problems is likely multifactorial including seizures and ADHD." Dr. Holcomb also felt that moderate to severe emotional distress was playing a central role in Achilles's cognitive functioning. He recommended proactive planning and organizational strategies, and advised Achilles to limit distractions, take occasional breaks, and maintain a healthy lifestyle.

In May 2013, Achilles saw Maria McHose, PMHNP, who treated him for ADHD and depression. Nurse McHose noted that Achilles was cooperative and friendly, had normal thoughts, a grossly intact memory, fair insight and judgment, and questionable impulse control. Nurse McHose later diagnosed Achilles with ADHD and depression, and assigned him a Global Assessment of Functioning ("GAF") score of 61, which indicates mild symptoms.

Nurse McHose found similar results at subsequent visits. Eventually, Nurse McHose prescribed Lexapro, and added Vyvnase in February 2014 to address Achilles's reports of "persistent avolition and attentional difficulties."

In December 2013, Achilles twice sought emergency treatment for seizures. When he followed up with Dr. Umashankar on December 9, 2013, Dr. Umashankar observed an episode that he characterized as a psychogenic non-epileptic seizure, and prescribed Lexapro and counseling. He advised Achilles that he did not need to seek emergency treatment for these non-epileptic episodes and should just lie down until they passed.

On January 8, 2014, Achilles saw Dr. Krzysztof Bujarski, a neurologist, who noted that Achilles had been diagnosed with idiopathic generalized epilepsy but had been doing quite well on medication until two months ago. He noted that Achilles reported experiencing new seizures and that he had had 50 such seizures in the two months prior to his appointment with Dr. Bujarski. Dr. Bujarski diagnosed him with likely "psychogenic nonepileptic seizures."

Achilles subsequently underwent EEG video monitoring to determine the etiology of his new reported seizures. During the overnight monitoring, Achilles had one event that did not register on the EEG, suggesting that it was not related to epilepsy.

On July 13, 2013, Achilles went to the hospital with a complaint of "episodic unresponsiveness," and his wife stated that he had occasionally been unresponsive for the past three days. During a neurologic examination, he followed commands, but slowly. He was diagnosed with conversion disorder and discharged with instructions to follow up with his primary care physician.

In March 2015, Achilles saw Dr. Umashankar. Achilles's wife and mother, who went with him to the visit, told Dr. Umashankar that Achilles had memory problems and had "one seizure like the old real seizure." Dr. Umashankar referred Achilles to a psychiatrist and noted that he was cleared to drive.

II.  <u>State Agency Examinations and Assessments</u>

A.  <u>Dr. Trina Jackson</u>

On December 21, 2013, Achilles underwent a consultative psychological examination with Dr. Trina Jackson, Psy.D. Dr. Jackson noted that Achilles "did not appear to be malingering or purposefully exaggerating," but "does appear to be somewhat preoccupied with his problems and perhaps magnifies them to some degree." She found that he could interact appropriately with others; he could understand and remember both short and detailed instructions; he could concentrate and persist independently and

on a sustained basis; and he could deal appropriately with work-related stress.  She diagnosed him with ADHD ("Well-managed with medication"), dysthymic disorder, and rule-out conversion disorder ("with documentation of pseudoseizures").  She recommended that Achilles restart his psychotropic medications and seek weekly counseling to help manage his reported pseudoseizures.

### B.   Dr. Edward Martin

On December 24, 2013, Dr. Edward Martin, a state agency psychologist, reviewed Achilles's available medical records, including Dr. Jackson's consultative report.  He opined that Achilles did not have a severe mental impairment.

### C.   Dr. Louis Rosenthall

On March 6, 2014, Dr. Louis Rosenthall, a state agency physician, reviewed Achilles's available medical records.  He opined that Achilles had no exertional limitations, but could never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards such as machinery and heights because of his epilepsy and use of narcotic pain medications.

### III.  Medical Source Statements

From 2013 through 2015, PA Gilbert filled out several Physician/Clinical Statement of Capabilities forms in relation

to Achilles's requests for benefits from the Financial Assistance for Needy Families program. On the March 21, 2013 form, PA Gilbert wrote that Achilles was "unable to drive or operate machinery," and that "there is no safe work environment for this patient." She also checked boxes indicating that Achilles required 24-hour care and monitoring, and that he could not perform any physical activities whatsoever. She further indicated that Achilles had marked difficulty maintaining attention for extended periods, and moderate difficulties with hygiene remembering locations and work-like procedures; understanding and remembering short, simple instructions; sustaining routines without frequent supervision; making simple work-related decisions; and performing at a consistent pace.

On the August 28, 2013 form, PA Gilbert proposed similar restrictions, but indicated that Achilles no longer had any mental limitations. On the January 28, 2014 form, however, PA Gilbert reinstated the mental limitations she had assessed in March 2013. On the January 19, 2015 form, PA Gilbert again opined that Achilles could not safely work, could not do any physical activities, and had moderate to marked mental limitations.

On the February 23, 2015 form, PA Gilbert opined that Achilles had been incapacitated since 1994 due to seizure disorder, lumbar radiculopathy, and chronic back pain, and that

she was basing her assessment on a December 16, 2014 examination.  Dr. Umashankar completed a similar form, indicating that Achilles had been disabled since "childhood."

IV.  Hearing Before ALJ

A hearing before the ALJ was held on Achilles's application on April 1, 2015.  Achilles was represented by an attorney and testified at the hearing.

Achilles testified that he had not worked since 2008.  When asked to focus on his physical and mental health issues since November 2012, Achilles testified that his "biggest issue has been [his] lower back pain," which had gotten to the point where he had "trouble lifting a gallon of milk."  He brought a cane to the hearing, but testified that it was not prescribed.  He said he had not been back to see Dr. Kamins since his October 2014 MRI, and was not scheduled to do so.

Achilles testified that he saw Dr. Umashankar for his seizures, but he was told that his pseudoseizures were psychiatric, so Dr. Umashankar could not help.  He said he had not sought any specialized mental health treatment in about a year because it did not help.

Achilles testified that oxycodone helped his back pain "[s]lightly," and his average pain level while lying around during the day was "between three and four," whereas doing

housework or other activities "can bring it up to a six."  He testified about his daily activities.

A vocational expert testified at the hearing.  The ALJ asked the vocational expert to consider a hypothetical individual, with the same age, education, and work history, and residual functional capacity as Achilles.  The vocational expert testified that such an individual could do light or sedentary jobs as a price marker, housekeeping cleaner, cafeteria attendant, data clerk, addresser, and toy stuffer.  The vocational expert testified that no jobs would accommodate excessive absenteeism or the need to lie down during the day.

V.   ALJ's Decision

The ALJ issued an unfavorable decision on May 14, 2015.  The ALJ found that Achilles had severe impairments due to epilepsy, dysthymic disorder (rule out conversion disorder), psychogenic non-epileptic seizures, obesity, and degenerative disc disease of the lumbar spine.  The ALJ also found that Achilles's impairments did not meet or equal a listed impairment.  The ALJ concluded that Achilles had the residual functional capacity to do light work under 20 C.F.R. § 416.967(b), except that he is unable to climb ladders, ropes and scaffolds, and is able to perform occasional stooping and crouching.  The ALJ also concluded that Achilles must avoid

exposure to potential hazards such as moving machinery, unprotected heights, and hot surfaces or hot appliances. She further concluded that Achilles is able to perform routine, day-to-day tasks, with few changes, and that he must avoid direct interaction with the general public, but is able to have incidental interaction.

With that evaluation, the ALJ found that Achilles could not do his past relevant work as a grinder operator or bottling attendant, but could do a significant number of light or sedentary jobs, i.e., price marker, housekeeping cleaner, cafeteria attendant, data clerk, addresser, and toy stuffer. Therefore, the ALJ found that Achilles was not disabled within the meaning of the Social Security Act. The Appeals Council affirmed that ALJ's decision, making the ALJ's decision the Acting Commissioner's final decision.

## Discussion

Achilles contends that the ALJ erred in her assessment of Achilles's residual functional capacity by ignoring his treating physician's opinion and by basing her residual functional capacity assessment on raw medical data. The Acting Commissioner moves to affirm.

I.  <u>Treating Physician's Opinion</u>

The ALJ is required to consider the medical opinions in a claimant's administrative record.  20 C.F.R. § 416.927(b). Medical opinions are evaluated based on the nature of the medical source's relationship with the claimant, the consistency of the opinion with the other record evidence, the medical source's specialty, and other factors that may be brought to the ALJ's attention.  § 416.927(c).  A treating medical source's opinion about the claimant's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  § 416.927(c)(2).  An ALJ must give "good reasons" for the weight given to a treating source's medical opinion. <u>Id.</u>

Achilles contends that the ALJ ignored his treating physician's medical opinion, citing the March 20, 2013 neuropsychological evaluation administered by Dr. Holcomb, who was supervised by Dr. Roth.  He argues that the ALJ should have addressed the evaluation results under the treating physician standard because, he contends, Dr. Roth was his treating psychiatrist.  The Acting Commissioner points out that Achilles has confused two different Dr. Roths.

Dr. Barry Roth was Achilles's treating psychiatrist who referred Achilles to Dr. Robert Roth for a neuropsychological evaluation. Dr. Holcomb, a post-doctoral neuropsychology fellow, conducted the evaluation under the supervision of Dr. Robert Roth. Neither Dr. Holcomb nor Dr. Robert Roth was Achilles's treating psychiatrist. Therefore, the evaluation results were not the opinion of a treating source, and the ALJ was not required to assess the evaluation under the treating source standard.

In any event, the ALJ did address the evaluation. The ALJ explained that the limitations found in the evaluation due to inattention and hyperactivity were not supported by the record. Specifically, Achilles's counselor doubted a diagnosis of ADHD because Achilles was able to play video games all day, and no other objective medical records supported a limitation due to hyperactivity. A consultative examiner also found that Achilles's ADHD symptoms were well controlled with medication.

Achilles also cites the findings made by PA Gilbert about certain mental or cognitive limitations but he does not explain what, if any, error he ascribes to the ALJ with respect to the evaluation of those opinions. PA Gilbert provided primary medical care, not psychological care, to Achilles, and the ALJ gave some weight to PA Gilbert's opinions pertaining to

Achilles's physical limitations.[3]  The ALJ addressed PA Gilbert's opinions at length, and Achilles has not shown any error in that analysis.  Therefore, Achilles has not shown that the ALJ ignored a treating source's opinion.

## II.  Residual Functional Capacity Assessment

Achilles argues that the ALJ's residual functional capacity assessment with respect to his limitations due to back pain and pseudo-seizures is not based on any medical evidence.  Instead, Achilles charges, the ALJ impermissibly relied on her own lay opinion to interpret raw medical data.  The Acting Commissioner contends that the ALJ properly relied on opinion evidence in the record to assess Achilles's functional capacity and fashioned an assessment that was more restrictive—that is favorable to Achilles—than most of the opinions provided.

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).  A residual functional capacity is assessed "based on all the relevant evidence in [the claimant's] case record."  Id.  In addition, the ALJ considers all of the

---

[3] As a Physician's Assistant, PA Gilbert is not an "acceptable medical source" and her opinion was not presumptively entitled to controlling weight. 20 C.F.R. § 416.913(a); Ayala v. Colvin, No. 3:16-cv-30009-KAR, 2017 WL 1148276, at *8 (D. Mass. Mar. 27, 2017).

claimant's medically determinable impairments, even those not found to be severe at Step Two. § 416.945(a)(2).

The ALJ's residual functional capacity assessment is reviewed to determine whether it is supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); Pacensa v. Astrue, 848 F. Supp. 2d 80, 87 (D. Mass. 2012). An ALJ may not "ignore medical evidence or substitute his own views for uncontroverted medical opinion." Nguyen, 172 F.3d at 35. On the other hand, the ALJ may "piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). In doing so, the ALJ may consider medical opinions in light of the record evidence and, giving the claimant the benefit of the doubt, may assess a more limited residual functional capacity than was found in the medical opinions. Schwartz v. Berryhill, No. 16-cv-163-SM, 2017 WL 3736789, at *6 (D.N.H. Aug. 30, 2017); Barup v. Soc. Sec. Admin., No. 16-cv-62-PB, 2017 WL 1194644, at *6 (D.N.H. Mar. 31, 2017); Deane v. Colvin, --- F. Supp. 3d ---, 2017 WL 1186319, at *11 (D. Mass. Mar. 29, 2017).

A.   Back pain

Dr. Rosenthall, a state consultant physician, found that Achilles had no exertional level limitations due to back pain

but that he must not do climbing activities and must avoid
exposure to hazards.  PA Gilbert found that Achilles could not
do work at any exertional level, even sedentary.  In her
residual functional capacity assessment, the ALJ limited
Achilles to light work, precluded climbing activities,
restricted certain postural activities to be done only
occasionally, and restricted exposure to hazards.

In making that assessment, the ALJ gave PA Gilbert's
opinion about Achilles's limitations some weight but explained
that the severity of limitations she found was not supported by
her own records or any of the other treatment records.  As such,
the ALJ adequately explained her reasons for giving PA Gilbert's
opinion only some weight.  The ALJ also gave Dr. Rosenthall's
opinion some weight but added a restriction to the light
exertional level because of additional medical evidence of back
pain and non-epileptic seizures added to the record after Dr.
Rosenthall's opinion.  Even assuming that adding these
additional limitations could be considered error, because the
added limitation was favorable to Achilles, at worst the
assessment would be harmless error.  See Schwarz, 2017 WL
3736789, at *6.

B. <u>Pseudo-Seizures and Mental Health</u>

Achilles faults the ALJ for failing to consider the limitations caused by his pseudo-seizures, depression, and ADHD in assessing his residual functional capacity. Achilles also argues that the ALJ's limitation to light work, imposed in part for the pseudo-seizures, was improper because there was no medical opinion to support that limitation. The Acting Commissioner contends that the ALJ properly assessed Achilles's mental functioning and seizure limitations.

1. <u>Consideration of pseudo-seizures, depression and ADHD</u>

The ALJ gave great weight to the opinion of the consultative examiner, Trina Jackson, a psychiatrist, who found that Achilles's ADHD was well-managed on medication and that he was able to function effectively and consistently.[4] The ALJ also explained that despite his reports of increased depression, Achilles's mental status examinations produced mostly normal results. The ALJ discounted PA Gilbert's opinions related to seizures and mental health because PA Gilbert is a primary care

---

[4] The ALJ gave some weight to the opinion of the state agency psychological consultant, Dr. Edward Martin, whom the ALJ mistakenly identified as Dr. Rosenthall. Dr. Martin found no severe mental impairments and only mild functional restrictions. The ALJ gave that opinion only some weight because she found that Achilles's counseling records supported some limitations because of the effects of situational stressors. The ALJ therefore included a restriction to routine, day-to-day tasks, with few changes.

provider and did not provide psychological care, and because her opinions conflicted with her own and other treatment notes and neurological records.

The ALJ noted Achilles's recent diagnosis of non-epileptic psychogenic seizures or pseudo-seizures. The ALJ explained that the pseudo-seizures had no clear trigger but were thought to be stress related. The ALJ commented that despite the pseudo-seizure diagnosis, Dr. Umashankar, Achilles's neurologist, had cleared him to drive.

The ALJ limited Achilles to light exertional capacity in part because of the evidence of non-epileptic seizures. The residual functional capacity assessment also included a restriction to routine, day-to-day tasks, with few changes because of the effects of situational stressors and restrictions not to climb and to avoid hazards. Taking all this into account, the decision shows that the ALJ did consider Achilles's pseudo-seizures and that the residual functional capacity assessment included limitations directed to the pseudo-seizures.

### 2. Limitations from pseudo-seizures

Achilles contends that the ALJ's limitations are improper because there is no opinion in the record that addresses his functional capacity in light of the pseudo-seizures. It was Achilles's burden, however, to show that he was disabled. [20]

C.F.R. § 416.912(a).  Achilles acknowledges that he did not
provide and the record did not include an opinion that assessed
his functional capacity in light of the pseudo-seizures.  In
contrast, as the ALJ noted, Achilles's treating neurologist
cleared him to drive, despite the pseudo-seizures.

The ALJ thus considered the evidence related to Achilles's
pseudo-seizures and fashioned commonsense limitations to address
their functional effects, if any.  See Chambers v. Colvin, No.
16-cv-087-LM, 2016 WL 6238514, at *9 (D.N.H. Oct. 25, 2016).
Achilles points to no opinion in the record that provides a
contrary assessment of his functional capacity in light of the
pseudo-seizures.  Under the circumstances presented here,
substantial evidence supports the ALJ's residual functional
capacity assessment.

## Conclusion

For the foregoing reasons, the claimant's motion to reverse
and remand (document no. 9) is denied.  The Acting
Commissioner's motion to affirm (document no. 11) is granted.

The clerk of court shall enter judgment accordingly and
close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 25, 2017

cc:  Robert J. Rabuck, Esq.
     Laurie Smith Young, Esq.